# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2638

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Michael Joe Wells, also known as | * | |
| Buster Wells, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: April 11, 2011
Filed: August 8, 2011

_____

Before WOLLMAN and MELLOY, Circuit Judges, and MILLER,[1] District Judge.

_____

WOLLMAN, Circuit Judge.

After Michael Joe Wells was indicted for conspiracy to manufacture methamphetamine, he moved to suppress evidence obtained during two searches of an outbuilding behind his house. The district court[2] granted his motion, and the government appeals. See 18 U.S.C. § 3731. We affirm.

_____

[1]The Honorable Brian S. Miller, United States District Judge for the Eastern District of Arkansas, sitting by designation.

[2]The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri.

In the early morning hours of May 20, 2009, Officer Shane Bates of the Poplar Bluff, Missouri police department received a tip from a confidential informant that Wells was manufacturing methamphetamine in an outbuilding behind his house. Bates drove past Wells's house a few times, but noticed nothing unusual. When he drove past a fourth time, however, sometime between 3:00 and 3:30 a.m., Bates noticed two open doors: one on a camper parked on the street in front of the house and the other on a shed behind the house. Both had been closed during his previous passes. According to Bates, he thought it was "possible" that the open doors signified a burglary. Suppression Hr'g Tr. at 10:5-6.

Bates called two other officers who were on patrol at the time, James Gerber and Timothy Akers, and the three agreed to meet in person "offsite" to discuss how to proceed. Id. at 11:17-21. At 3:56 a.m., Akers called police headquarters with their plan: "Me, Gerber and Bates are fixing to go do a knock-and-talk on Riverview, 924 North Riverview," that is, Wells's house. D. Ct. Order of June 14, 2010, at 2.

Wells's house is on a lot that, viewed from the street (facing south), is 68 feet wide by 178 feet deep. The lot is fenced along its sides and back, but not along its front. The house is set back 27 feet from the street and, at 44 feet wide, occupies nearly two-thirds of the width of the lot. A short paved driveway leads from the street to a carport set into the house, and a paved walkway leads from that driveway to the front door. Additionally, a door in the carport leads into the house.

On either side of the house there is a 12-foot-wide gap between the house and the lot fence. The gap on the western side is covered with grass, while the gap on the

eastern side forms part of an unpaved driveway running from the street, along the eastern side of the house, and into the backyard to a shed near the back of the lot.[3]

Behind the house, and across the backyard from the unpaved driveway, is a two-story outbuilding. It has a ground-level door that faces east, towards the unpaved driveway, containing a large pane of frosted glass. There is also a second-story door facing north, towards the house, accessible by a flight of wooden stairs. The outbuilding sits at least 10 feet behind the house and is, at best, poorly visible from the street.

The three officers arrived at Wells's house at about 4:00 a.m. Akers and Gerber looked inside the street-parked camper to be sure no one was inside, while Bates walked down the unpaved driveway to look in the backyard shed. There was no one inside the camper, and Bates saw only "what [he] call[s] junk" in the shed. Suppression Hr'g Tr. at 29:14-18. Having found nothing, the three officers regrouped on the unpaved driveway near the rear (southeast) corner of the house. From there they had a view across the backyard of the two-story outbuilding and its ground-level door and could see—through the door's frosted-glass window—that a light was on inside.

The officers walked across the backyard to the lighted door. Through its window the officers could see "movement inside . . . and that there [were] actually people in there," although the window treatment made it impossible to "identify an[y] individual[s]." Id. 40:2-16. According to Bates, the officers "waited, I don't know, maybe 30 seconds, and [Gerber] knocked on the door." Id. at 12:14-18. Wells answered, and as the door opened the officers immediately "smell[ed] a strong odor of burnt marijuana, and [saw that] there was smoke in the air." Id. at 13:2-14.

---

[3]The shed that Bates testified had its door open.

The officers ordered Wells and another man who was with him, Charles Brummit, to come outside. Gerber then went inside to make sure no one else was in the building. While inside he saw "a large bag of marijuana on the table or on a shelf right beside the door." Id. at 45:15-23. Wells and Brummit were arrested for possession of marijuana, and a search of Wells's person revealed "a coffee filter with methamphetamine in it." Id. at 83:16-21.

Later that morning, the officers obtained a search warrant for the outbuilding, supported in part by the evidence collected at the time of Wells's arrest. Pursuant to that warrant, the officers found and "seized 34 items from the [outbuilding] as evidence of the manufacture of methamphetamine." D. Ct. Order of June 14, 2010, at 6.

After being indicted for conspiracy to manufacture methamphetamine, Wells moved to suppress the evidence obtained both during the nighttime "knock-and-talk" and pursuant to the later search warrant. He argued that the officers had violated the Fourth Amendment when they first entered the protected curtilage of his house (his backyard) without a warrant or probable cause coupled with exigent circumstances, and that their violation required suppression of the "fruit[s]" of that "poisonous tree," see, e.g., United States v. Alvarez-Manzo, 570 F.3d 1070, 1077 (8th Cir. 2009), which included any evidence obtained pursuant to the search warrant.

The government responded that Wells had no reasonable expectation of privacy in the unpaved driveway and therefore the officers had been lawfully standing in it when they observed the lighted outbuilding. In any event, the government argued, even if the unpaved driveway is protected curtilage, the officers were justified in entering it because they were responding to an exigent circumstance, *i.e.*, the possible ongoing burglary.

-4-

The district court granted Wells's motion. Noting that "the backyard area was fenced in on three sides," and that, "except for the narrow unpaved" driveway leading to the shed, "the backyard could not be viewed from the street," the district court concluded that Wells "had a protectable expectation of privacy in [] the entirety of the property behind his residence, especially at 4:00 a.m." D. Ct. Order of June 14, 2010, at 7. Furthermore, it rejected "the government's contention that the existence of the unpaved driveway constituted a tacit invitation to the public to enter on the premises by way of th[at] driveway," reasoning that "[t]o the extent that the general public, and the police, were tacitly invited to enter on the premises, the invitation extended, as in the case of most premises, solely to the front [paved] driveway and the front door of the residence." Id. And it concluded that "the totality of the circumstances" did not support the government's claim that an exigent circumstance—a "perceived burglary," "based solely on the officer's observation" of two open doors—excused the officers' failure to obtain a warrant prior to entering Wells's backyard. Id. at 5. It therefore "suppress[ed] from evidence any and all items seized by the arresting officers from [Wells's] person, possessions, out building and residence on May 20, 2009." Def.'s Mot. to Suppress Evidence; D. Ct. Order of June 14, 2010, at 8.

The government appeals, arguing that the district court erred in concluding that Wells's had a reasonable expectation of privacy in any part of the unpaved driveway.

II.

"The right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. This "protection extends to the curtilage surrounding a home," United States v. Weston, 443 F.3d 661, 666 (8th Cir. 2006), which "is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore has been considered part of the home itself for Fourth Amendment purposes." Oliver v. United States, 466 U.S. 170, 180 (1984) (citation and internal

quotation marks omitted). Consequently, curtilage generally "should be treated as the home itself." United States v. Dunn, 480 U.S. 294, 300 (1987).

To determine whether the officers violated Wells's Fourth Amendment right, we must answer two questions:  (1) Did the officers enter the curtilage of Wells's home when they walked along the unpaved driveway to the backyard?; and, if so, (2) Was that entry reasonable?

A.

The district court determined that the portion of the unpaved driveway extending past the rear of Wells's home and into the backyard is part of the home's curtilage.  See D. Ct. Order of June 22, 2010, at 1 (concluding that Wells "had a protectable expectation of privacy to th[e] part of the driveway in the back of the house").[4]

_____

[4]The government points out that "the District Court never actually made a factual determination that the unpaved driveway and shed were part of the curtilage of the home, instead simply stating that Wells 'had a reasonable expectation of privacy to that part of the driveway in the back of the house.'" Appellant's Br. at 19. But the word "curtilage," used in this context, is nothing more than a placeholder for those areas surrounding the home in which the homeowner reasonably may expect privacy. See Kyllo v. United States, 533 U.S. 27, 33 (2001) ("[A] Fourth Amendment search does *not* occur—even when the explicitly protected location of a *house* is concerned—unless the individual manifested a subjective expectation of privacy in the object of the challenged search, and society is willing to recognize that expectation as reasonable." (internal quotation marks omitted)); Oliver, 466 U.S. at 180 ("[C]ourts . . . have defined the curtilage . . . by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private."); United States v. Arboleda, 633 F.2d 985, 992 (2d Cir. 1980) (Friendly, J.) ("Terming a particular area curtilage expresses a conclusion; it does not advance Fourth Amendment analysis.  The relevant question is . . . whether the defendant has a legitimate expectation of privacy in the area.").

Before we review that determination, we note the parties' disagreement on the proper standard of review. Wells argues that a district court's curtilage determination is a finding of fact, reviewable only for clear error. He points out that we have previously applied the clearly-erroneous standard to such determinations, see, e.g., United States v. Friend, 50 F.3d 548, 552 (8th Cir. 1995), *cert. granted, judgment vacated, and case remanded on other grounds*, 517 U.S. 1152 (1996) (mem.), and therefore insists that we, as a panel, must do so again, see Kostelec v. State Farm Fire and Casualty Co., 64 F.3d 1220, 1228 n.8 (8th Cir. 1995) (A panel is "powerless to resolve [] conflict in our decisions, as one panel of this Court is not at liberty to overrule an opinion filed by another panel. Only the Court en banc may take such a step." (internal quotation marks omitted)). The government acknowledges that we have at times applied the clearly-erroneous standard, but urges that the Supreme Court's decision in Ornelas v. United States, 517 U.S. 690 (1996), calls for *de novo* review.[5]

Ornelas holds only that we must review *de novo* a district court's reasonable-suspicion and probable-cause determinations—it does not by itself mandate the same for curtilage determinations. Nevertheless, there are persuasive reasons to conclude—as have all of the circuits to consider this question post-Ornelas—that *de novo* review applies to curtilage determinations. See, e.g., United States v. Cousins, 455 F.3d 1116, 1121 (10th Cir. 2006) (gathering cases).

Accordingly, were we the first panel of our court to review a district court's curtilage determination post-Ornelas, we might well hold that *de novo* review applies to such determinations. But we are not the first. To the contrary, since Ornelas we

_____

[5]As the government correctly notes, "subsidiary factual findings informing [the curtilage] determination would still, of course, be reviewed for clear error." Appellant's Br. at 18. At issue here is the standard of review to be applied to the ultimate determination "that a particular area is or is not part of a home's curtilage." Id. at 19.

-7-

have reviewed a district court's curtilage determination in seven reported cases. See United States v. Brooks, No. 10-3826, slip op. at 5-6 (8th Cir. July 14, 2011); Nikolas v. City of Omaha, 605 F.3d 539, 545-46 (8th Cir. 2010); United States v. Lakoskey, 462 F.3d 965, 973 (8th Cir. 2006); United States v. Boyster, 436 F.3d 986, 991-92 (8th Cir. 2006); United States v. Gerard, 362 F.3d 484, 487-88 (8th Cir. 2004); United States v. Pennington, 287 F.3d 739, 745-46 (8th Cir. 2002); United States v. Mooring, 137 F.3d 595, 596-97 (8th Cir. 1998).

In five of those cases—Brooks, Nikolas, Lakoskey, Boyster, and Pennington—we affirmed a district court's determination that an area was part of a home's curtilage without mentioning a deferential standard of review.[6] In the other two—Gerard and Mooring—we explicitly stated that we were reviewing for clear error only. See Gerard, 362 F.3d at 487 (8th Cir. 2004) ("Applying these four [Dunn] factors to Gerard's farmstead and the area immediately surrounding it, the district court's finding that the garage lay outside the curtilage of the farmhouse was not clearly erroneous."); Mooring, 137 F.3d at 596 (8th Cir. 1998) ("After reviewing the record in light of the relevant [Dunn] factors, we conclude the district court's finding that the barn was not within the farmhouse's curtilage was not clearly erroneous.").[7]

---

[6]Except for general statements of deference to factual findings. See, e.g., Brooks, slip op. at 4 ("We review a district court's conclusions of law regarding a motion to suppress de novo and findings of fact for clear error.").

[7]The Mooring appellants cited Ornelas in their opening brief, arguing: "The factual determinations underlying the question of curtilage are reviewed under the clearly erroneous standard; but the ultimate determination of whether the Fourth Amendment was violated is reviewed de novo." Br. of Appellant at vi, United States v. Mooring, 137 F.3d 595 (8th Cir. 1998) (No. 97-2682) (citation omitted). In their petition for panel and en banc rehearing, they argued more explicitly that under Ornelas "the panel was required to view the curtilage issue de novo." Appellant's Pet. for Reh'g at 1, United States v. Mooring, 137 F.3d 595 (8th Cir. 1998) (No. 97-2682). The petition was denied.

Having acknowledged the conflict in our holdings, it is not within our power to resolve it.  See Kostelec, 64 F.3d at 1228 n.8.  Nor would resolution of that conflict affect the result in this case.  For the reasons set forth below, even upon *de novo* review we agree with the district court that the portion of Wells's unpaved driveway extending past the rear of his home and into the backyard is part of the home's curtilage.  *A fortiori* that determination is not clearly erroneous.

The "centrally relevant consideration" in any curtilage determination is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."  Dunn, 480 U.S. at 301.  We resolve such questions "with particular reference to four factors: [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by."  Id. at 301.

The first three factors weigh heavily in favor of the district court's conclusion that the portion of the unpaved driveway extending past the rear of Wells's home is part of the home's curtilage.  The unpaved driveway runs alongside and abuts the home's eastern wall.  The area of the driveway on which the officers were standing when they observed the lighted outbuilding is just behind the home and only a few feet from it.  In order to arrive at that point, passers-by would be required to walk, from the street, 27 feet down the unpaved driveway to the front (northeast) corner of the home, and then another 24 feet to the rear (southeast) corner, passing through the 12-foot-wide gap between the home and the lot fence.  Along the way they would pass both the paved walkway leading to Wells's front door and the door in the

---

The Gerard appellant did not cite Ornelas, but argued:  "This Court reviews the district court's findings of fact for clear error and the lower court's determination that the Fourth Amendment was not violated *de novo*."  Br. of Appellant at 4, United States v. Gerard, 362 F.3d 484 (8th Cir. 2004) (No. 03-1655).

carport. And, at all times they would be flanked on three sides by Wells's fence, which encloses the lot on its sides and back.

Additionally, the record contains evidence that the backyard—which includes the part of the driveway where the officers stood—is used for "the intimate activity associated with the sanctity of [Wells]'s home and the privacies of life." Oliver, 466 U.S. at 180 (internal quotation marks omitted). Among other things, it contains a child's wagon and sled, a boat, a lawnmower, a rabbit hutch, and a burn barrel. And, in any event, "[o]ne is not required to keep particular domestic objects on one's lawn in order to maintain a reasonable expectation of privacy." United States v. Garrott, 745 F. Supp. 2d 1206, 1212 (M.D. Ala. 2010). A backyard that is accessible only by walking around the side of a home is a place generally recognized as "an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." Florida v. Riley, 488 U.S. 445, 452 (1989) (O'Connor, J., concurring) (quoting California v. Ciraolo, 476 U.S. 207, 213 (1986)); accord Daughenbaugh v. City of Tiffin, 150 F.3d 594, 601-02 (6th Cir. 1998) (concluding that an entire backyard was within the curtliage of the home); United States v. Jenkins, 124 F.3d 768, 772-73 (6th Cir. 1997) (same); cf. Brooks, slip op. at 2, 5-6 (concluding that the backyard of an "urban multi-family dwelling"—accessible from a "public alley . . . located directly behind the backyard area"—was not part of the curtilage of an apartment inside the dwelling).

The final factor—"the steps [Wells took] to protect the area from observation by people passing by," Dunn, 480 U.S. at 301—is less conclusive. Certainly there are large portions of the backyard—including the outbuilding—that are not visible from the street. But the entirety of the unpaved driveway is visible from the street, at least if the observer stands at its northern end and looks directly down it. The government argues that this should be enough to deprive Wells of any reasonable expectation of privacy in any part of the unpaved driveway, including the part extending into the backyard. We are hesitant, however, to give this factor controlling weight.

-10-

A reasonable expectation of privacy will not always be an expectation of absolute privacy. See, e.g., Katz v. United States, 389 U.S. 347, 349-52 (1967) ("[Katz] was as visible after he entered [the telephone booth] as he would have been if he had remained outside. But what he sought to exclude when he entered the booth was not the intruding eye—it was the uninvited ear. He did not shed his right to do so simply because he made his calls from a place where he might be seen."). Certainly Wells would have no cause to complain had the officers, standing in the public street, observed him openly cooking methamphetamine on the unpaved driveway, just as he would have no cause to complain had the officers observed the same through an open window in his home. "The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." Ciraolo, 476 U.S. at 213.

But an officer's ability to observe through open windows what happens inside a home does not altogether extinguish the homeowner's otherwise reasonable expectation of privacy in the home itself. Not even probable cause, absent an exigent circumstance, would permit an officer to enter that home without a warrant to make an arrest or seize contraband. See Coolidge v. New Hampshire, 403 U.S. 443, 468 (1971) ("[P]lain view alone is never enough to justify the warrantless seizure of evidence. . . . [It] may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure."). That a homeowner exposes some portion of his dwelling to public view is not a license for officers to treat it as public space.

Similarly, we think that a homeowner may expose portions of the curtilage of his home to public view while still maintaining some expectation of privacy in those areas. In this case, for example, Wells certainly exposed his unpaved driveway to public view, and therefore could not reasonably expect that members of the public would not observe whatever he might do there. But he could reasonably expect that

-11-

members of the public would not traipse down the drive to the back corner of his home, from where they could freely observe his entire backyard. Accord Garrott, 745 F. Supp. 2d at 1213 ("Though the yard was visible from beyond the fence, it is important to distinguish the physical invasion into defendants' backyard that took place in this case from visual inspection from a lawful vantage point." (internal quotation marks omitted)). We therefore will not accord this fourth factor the controlling weight the government's position requires.

Although we recognize "that combining these factors [does not] produce[] a finely tuned formula" to be "mechanically applied," Dunn, 480 U.S. at 301, we think that this "unique set of facts," United States v. Reilly, 76 F.3d 1271, 1276 (2d Cir. 1996), requires the conclusion that "the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Dunn, 480 U.S. at 301.

Accordingly, we conclude that the officers were standing in an area in which Wells's had a reasonable expectation of privacy, *i.e.*, the curtilage of his home, when they observed the lighted outbuilding.

B.

The other question remains: Was the officers' entry onto the curtilage constitutionally unreasonable? When police officers choose to enter a home, the Fourth Amendment requires that they first obtain consent or a warrant, or, in exigent circumstances, have probable cause. See Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); Payton v. New York, 445 U.S. 573, 586-87 (1980). Because we treat curtilage as part of the home, Oliver, 466 U.S. at 180, those same rules apply here.

There is no dispute that the officers did not have Wells's express consent or a warrant when they entered Wells's backyard, nor has the government appealed the

-12-

district court's conclusion that its "claim of exigent circumstances as an exception to the warrant requirement [was] simply too weak to pass constitutional muster." D. Ct. Order of June 14, 2010, at 5. Therefore, if the officers' entry can be justified, it could only be under those cases recognizing that "no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways." United States v. Reed, 733 F.2d 492, 501 (8th Cir. 1984). This principle permits police officers—consistent with the Fourth Amendment—to "approach[] the front door to announce their presence," make "inquir[ies]," and "request consent to search the remainder of the property," "commonly referred to as a 'knock and talk.'" United States v. Weston, 443 F.3d 661, 667 (8th Cir. 2006) (citing Reed, 733 F.2d at 501).

We can think of two possible justifications for this rule. One is that "areas generally made accessible to visitors—such as driveways, walkways, or similar passageways," Reed, 733 F.2d at 501, are simply not areas in which a person can reasonably maintain any expectation of privacy. See, e.g., United States v. Maestas, 639 F.3d 1032, 1036-37 (10th Cir. 2011); United States v. Pineda-Moreno, 591 F.3d 1212, 1214-15 (9th Cir. 2010). The other is that homeowners grant members of the visiting public—mail carriers, sanitation workers, neighbors, and Girl Scouts, to name a few—an implied consent to enter these areas for those purposes that accompany the normal interactions of a social, civilized society. Accord United States v. Simms, 626 F.3d 966, 969-71 (7th Cir. 2010).

The district court identified the latter as the justification for the "knock-and-talk" rule, see D. Ct. Order of June 22, 2010, at 2, and we, having already concluded that the officers were in a place where Wells reasonably could expect privacy, likewise will consider whether the officers entered the curtilage pursuant to Wells's implied consent. We conclude that they did not.

-13-

To the extent that the "knock-and-talk" rule is grounded in the homeowner's implied consent to be contacted at home, we have never found such consent where officers made no attempt to reach the homeowner at the front door. In United States v. Anderson, we concluded that it was constitutionally reasonable for police officers, who were trying to find a suspect "to question him about [a] theft," to "proceed[] to the rear [of the suspect's home] after receiving no answer at the front door," even though doing so "invaded an area with respect to which [the suspect] had a reasonable expectation of privacy." 552 F.2d 1296, 1300 (8th Cir. 1977).

Similarly, in United States v. Raines, we concluded that there was no Fourth Amendment violation when a police officer attempting to serve civil process "receiv[ed] no response at the front door" of a home, and so "proceeded to the back of the home." 243 F.3d 419, 420 (8th Cir. 2001). The officer testified that "because it was a pleasant summer evening and several cars were parked in the driveway, he thought it likely the occupants were outside in the backyard" and might be "unable to hear him knocking at the front door." Id. at 420-21.

In both cases, police officers first made an attempt to contact the homeowners at the place they would most logically be reached—the front door. Here, the officers made no attempt to raise Wells at the front door, nor did they pause at the door in the carport. Instead, they first walked to the back corner of the home from where they had a view of the entire backyard. Furthermore, this was no "pleasant summer evening"—it was 4:00 a.m. Other than perhaps their suspicion of drug manufacturing, there was no reason for the officers to think that Wells would be found in the backyard at that time, nor was there any reason for them to think that Wells generally would receive "visitors" there. That the officers were standing on a "driveway," Reed, 733 F.2d at 501, is not a sufficient answer. Unlike the paved driveway in Wells's front yard, which connects to his front door via a paved walkway, the unpaved driveway passing around the side of the home is not an area "generally made accessible to visitors." Id. We are not prepared to extend the

-14-

"knock-and-talk" rule to situations in which the police forgo the knock at the front door and, without any reason to believe the homeowner will be found there, proceed directly to the backyard.  Accord Young v. City of Radcliff, 561 F. Supp. 2d 767, 788 n.12 (W.D. Ky. 2008) ("Sneaking around the backyard is not part of a legitimate constitutional 'knock and talk.'").  Accordingly, the officers' entry in this case cannot be justified as a "knock-and-talk."

III.

The order suppressing the evidence is affirmed.

_____