# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-3130/19-3346

_____

United States of America

*Appellee/Cross-Appellant*

v.

Jerry Lee Bennett, Jr.

*Appellant/Cross-Appellee*

_____

Appeal from the United States District Court
for the Southern District of Iowa – Davenport

_____

Submitted: June 19, 2020
Filed: August 25, 2020

_____

Before LOKEN and GRASZ, Circuit Judges, and CLARK,[1] District Judge.

_____

CLARK, District Judge.

With valid arrest warrants in hand and standing on neighboring property, a police officer recognized Jerry Lee Bennett, Jr. walking out of the back of a residence. The officer and his partner ordered Bennett to stop, and after initially

---

[1]The Honorable Stephen R. Clark, United States District Judge for the Eastern District of Missouri, sitting by designation.

refusing, Bennett complied; when the officers arrested Bennett, they found a loaded firearm on him. Bennett appeals his conviction for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Bennett asserts that the district court[2] erred by denying his motion to suppress under the Fourth Amendment. The United States cross appeals, challenging the district court's determination that Bennett did not qualify for a 15-year minimum sentence under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1). We affirm both the appeal and cross-appeal.

## I.  Background

In October 2018, the Davenport, Iowa Police Department received an anonymous tip on the whereabouts of Jerry Bennett, who was wanted on outstanding arrest warrants. According to the tip, Bennett could be found at "2330 1st" in Davenport. The tip further indicated that Bennett drove a "grey Charger" and was living with someone identified only as "T Cookie." Davenport police officers Brandon Askew and Nate Kelling knew Bennett was prone to carry firearms. The officers attempted to go to the tip location to look for Bennett, but "2330 West First Street" in Davenport did not exist.

Askew and Kelling also were already familiar with an individual named Terry Cook, who lived at 2330 West Second Street, approximately one block away. Accordingly, the officers proceeded to that address to continue their search. There, they observed two gray Dodge Chargers parked on the street outside the residence. Another individual known to the police for drug activity, David Bolinger,[3] occupied one of the Chargers. Bolinger told the officers that he had come to the address to purchase cabinets, and that someone named "Jerry" was inside. Shortly thereafter, Askew and Kelling observed a white pickup truck leave the residence. Another

[2]The Honorable John A. Jarvey, Chief Judge, United States District Court for the Southern District of Iowa.

[3]The record is unclear on whether the correct spelling is "Bollinger" or "Bolinger."

officer stopped the truck and identified the driver as Terry Cook. After learning that Bennett was not in the pickup, Askew and Kelling returned to 2230 West Second Street.

As they approached the house in their patrol vehicle, the officers observed a man matching Bennett's general description walking out of the back of the residence. Askew, who was familiar with Bennett from previous police encounters, exited the patrol car first, with Kelling following. As he approached 2330 West Second Street, but while still standing on the adjacent property, Askew caught a brief glimpse of Bennett's face and recognized him. Askew continued onto the 2330 West Second Street property and walked towards Bennett in the backyard. He ordered Bennett to stop; Bennett initially refused but then complied. The officers placed Bennett under arrest and secured him in handcuffs. At the time, Bennett had a loaded .25 caliber Derringer pistol in his back pocket.

After being indicted for being a felon in possession of a firearm, Bennett filed a motion to suppress, arguing that the firearm should be excluded because the officers unlawfully entered the curtilage of the property to make the arrest. After a hearing, the district court denied the motion.

Subsequently, Bennett pleaded guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). At the sentencing hearing, the United States argued that Bennett's sentence should be enhanced under ACCA based on his prior convictions under Iowa law for willful injury, possession of methamphetamine with intent to deliver, and going armed with intent. Citing "ambiguous" case law from this Court, the district court found that going armed with intent is not a "violent felony" under ACCA, and thus declined to impose ACCA's 15-year mandatory minimum sentence. The court imposed a sentence of 110 months.

## II.  Discussion

### A.  Motion to Suppress

"We review the denial of a motion to suppress de novo but the underlying factual determinations for clear error, giving due weight to inferences drawn by law enforcement officials." *United States v. Tamayo-Baez*, 820 F.3d 308, 312 (8th Cir. 2016). We may affirm the district court's Fourth Amendment decision on any basis supported by the record. *United States v. Harris*, 747 F.3d 1013, 1016 n.3 (8th Cir. 2014).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). The Fourth Amendment does not, however, prevent all investigations on private property. *Id.* Whether a particular search violates the Fourth Amendment "requires examination of whether the person claiming the constitutional violation had a 'legitimate expectation of privacy in the premises' searched." *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) (quoting *Rakas v. Illinois*, 439 U.S. 128, 133 (1978)).

Thus, "[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." *United States v. Wells*, 648 F.3d 671, 678 (8th Cir. 2011) (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). On the other hand, the right to be free from unreasonable searches in one's home "would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity." *Jardines*, 569 U.S. at 6. Accordingly, the Fourth Amendment's protections extend to the "curtilage surrounding a home, which is the area to which extends the intimate activity associated with the sanctity of a man's

home and the privacies of life, and therefore has been considered part of the home itself for Fourth Amendment purposes." *Wells*, 648 F.3d at 675 (internal citation omitted). Thus, curtilage generally "should be treated as the home itself." *Id.* (quoting *United States v. Dunn*, 480 U.S. 294, 300 (1987)).

However, "[w]here a legitimate law enforcement objective exists, a warrantless entry into the curtilage is not unreasonable under the Fourth Amendment, provided that the intrusion upon one's privacy is limited." *United States v. Bearden*, 780 F.3d 887, 893 (8th Cir. 2015) (quoting *United States v. Weston*, 443 F.3d 661, 667 (8th Cir. 2006)). Thus, "no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways." *Wells*, 648 F.3d at 679. "[A] police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do." *Jardines*, 569 U.S. at 8 (internal quotation marks omitted). Our cases refer to this principle as the "knock-and-talk" rule. *Wells*, 648 F.3d at 679.

Thus, in *Weston*, we found no Fourth Amendment violation where officers entered an unlocked gate and proceeded to the front door of the home, where they discovered incriminating evidence. 443 F.3d at 667. Similarly, in *United States v. Raines*, 243 F.3d 419, 421 (8th Cir. 2001), we found no Fourth Amendment violation where the officer entered the backyard of a home to serve civil process on an individual reasonably believed to be present. After getting no response at the front door but seeing several cars in the driveway, the officer proceeded to the backyard, which the court considered to be a limited intrusion. *Id.* at 420-21. Once there, the officer saw marijuana plants in plain view. *Id.* at 421. We upheld the seizure of the contraband because the officer was pursuing a legitimate law enforcement objective (serving civil process) and made a limited intrusion upon the defendant's privacy interests. *Id.*

Bennett argues that the officers violated his Fourth Amendment rights because they did not reasonably believe he resided at 2330 West Second Street before they entered the curtilage of the property to arrest him. "[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *United States v. Glover*, 746 F.3d 369, 373 (8th Cir. 2014) (quoting *Payton v. New York*, 445 U.S. 573, 603 (1980)); *see also United States v. Reed*, 921 F.3d 751, 755 (8th Cir. 2019). When officers are unsure whether the suspect resides in the home, "our court allows 'police entry if the arresting officers executing the arrest warrant at [a] third person's home have a *reasonable belief* that the suspect resides at the place to be entered and have reason to believe that the suspect is present at the time the warrant is executed.'" *Glover,* 746 F.3d at 373 (quoting *United States v. Powell*, 379 F.3d 520, 523 (8th Cir. 2004) (emphasis in original)). Citing *Glover* and *Reed*, Bennett argues that the officers were not permitted to enter the curtilage unless they reasonably believed he was present and resided at the property. We find these cases distinguishable because Askew recognized Bennett, and thus knew he was present, before he ever entered the property. *See Weston*, 443 F.3d at 667 (limited intrusion onto curtilage is permissible for legitimate law enforcement objective); *Raines*, 243 F.3d at 421 (same).

In *Reed*, an officer went to the defendant's residence to execute an arrest warrant. 921 F.3d at 753. Unsure which door was the primary entrance, the officer proceeded to the back deck where he discovered drug paraphernalia. *Id.* Noting that a deck may be part of the curtilage, we allowed use of the evidence because the officer reasonably believed the defendant was present and resided at the residence when he went on to the deck. *Id.* at 755-56. *Glover* involved a motion to suppress evidence found inside a home by officers attempting to execute an arrest warrant. 746 F.3d at 372. Determining that the officers reasonably believed the defendant was present and resided in the home, we held that the officers' entry into the home was permissible. *Id.* at 374. Neither *Glover* nor *Reed* involved the factual situation presented here: i.e., an officer, armed

with a valid arrest warrant, who positively identified the defendant before entering the property, then entered the curtilage for the sole purpose of making the arrest.

The district court found that Askew recognized Bennett before he set foot on the curtilage of the home, and that finding was not clearly erroneous.[4] Askew testified at the suppression hearing that he saw and recognized Bennett's face while approaching 2330 West Second Street, but still standing on the adjacent property. The district court credited Askew's testimony that he was able to recognize Bennett, even from this distance, based on their prior interactions. "A district court's decision to credit a witness's testimony . . . can almost never be a clear error unless there is extrinsic evidence that contradicts the witness's story or the story is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *United States v. Wright*, 739 F.3d 1160, 1167 (8th Cir. 2014) (quoting *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir. 1995)).

Having determined that Askew recognized Bennett *before* he entered the curtilage, the district court deemed it "irrelevant" whether the police had a reasonable belief that Bennett lived in the home. Citing *Weston* and *Raines*, the district court determined that the officers had a legitimate law enforcement objective and their intrusion on Bennett's privacy interests was minimal. We agree. The valid warrants for Bennett's arrest provided the officers a legitimate law enforcement objective to enter the property. Further, any intrusion on Bennett's privacy interests was minimal because Bennett placed himself in a visible location and the officers saw him from the street. *See Ciraolo*, 476 U.S. at 213 ("Fourth Amendment protection of the home has never been extended to

---

[4]Where Askew was standing when he recognized Bennett is a "subsidiary factual finding" we review for clear error. *See Wells*, 648 F.3d at 676 n.5. For the reasons set forth here, even if we were to apply the *de novo* standard, we would find that Askew recognized Bennett before he entered the home's curtilage. *Id.* at 677.

require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.").

Bennett argues that the officers, under the "knock-and-talk" rule, were required to first check at the front door rather than entering the backyard. In *Wells*, we declined "to extend the 'knock-and-talk' rule to situations in which the police forgo the knock at the front door and, *without any reason to believe the homeowner will be found there*, proceed directly to the backyard." 648 F.3d at 680 (emphasis added). *Wells* simply does not apply because Askew saw and recognized Bennett before Askew stepped on the property. In *Raines*, we held it permissible for the officer, after checking the front door, to enter the backyard for the purpose of serving civil process because the circumstances of a "pleasant summer evening" and multiple cars parked in the driveway made it reasonable for the officer to conclude the occupants were in the backyard. 243 F.3d at 421. Here, Askew already *knew* Bennett was in the backyard. Thus, on these facts, the officers were not required to make a pointless trip to the front door. Because Askew recognized Bennett before entering the property, any incursion onto the curtilage was a "limited intrusion" for a "legitimate law enforcement objective." *Weston*, 443 F.3d at 667.

The officers discovered the gun in Bennett's possession in a routine search incident to his arrest. *See United States v. Pratt*, 355 F.3d 1119, 1124 (8th Cir. 2004) ("The search of an arrestee's person has long been upheld as reasonable under the Fourth Amendment"). Accordingly, the district court properly denied Bennett's motion to suppress.

## B.    Armed Career Criminal Enhancement

ACCA imposes a 15-year mandatory minimum sentence if a defendant has been convicted as a felon in possession of a firearm "and has three previous convictions . . . for a violent felony or a serious drug offense, or both[.]" 18 U.S.C.§ 924(e)(1). The district court found that Bennett's prior convictions for

willful injury, in violation of Iowa Code § 708.4(1), and possession of methamphetamine with intent to deliver, in violation of Iowa Code § 124.401, constituted Bennett's only qualifying prior convictions; thus, the district court did not apply ACCA's mandatory minimum sentence. The United States cross appeals the district court's determination, claiming that Bennett's conviction for going armed with intent, in violation of Iowa Code § 708.8, constitutes an ACCA predicate "violent felony." We review *de novo* the question whether Bennett's conviction qualifies as a violent felony under ACCA. *Boaz v. United States*, 884 F.3d 808, 809 (8th Cir. 2018).

ACCA defines "violent felony" to include any crime punishable by imprisonment for more than one year which "has as an element the use, attempted use, or threatened use of physical force against the person of another[.]" 18 U.S.C. § 924(e)(2)(B)(i). "[P]hysical force" means "force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010). The United States argues that the Iowa crime of going armed with intent is a "violent felony" because it necessarily involves the attempted use of physical force against the person of another. We disagree.

"To determine whether a prior conviction is a violent felony, courts apply a categorical approach, looking to the statute of conviction to determine whether that conviction necessarily has, as an element, the use, attempted use, or threatened use of physical force against the person of another." *United States v. Myers*, 928 F.3d 763, 765 (8th Cir. 2019). If there is a "realistic probability" that the statute encompasses conduct not involving the use, attempted use, or threatened use of physical force, then the statute "sweeps more broadly" than ACCA's definition of violent felony, and ACCA's enhancement does not apply. *Martin v. United States*, 904 F.3d 594, 596 (8th Cir. 2018).

"If the statute of conviction defines more than one crime by listing alternative elements, we apply a 'modified categorical approach' to determine which of the alternatives was the offense of conviction." *United States v.*

*Winston*, 845 F.3d 876, 877 (8th Cir. 2017) (citing *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016)). Under the modified categorical approach, the sentencing court may look to "a limited class of documents in the judicial record, including the charging document, written plea agreement, and plea colloquy transcript" to determine what crime, with what elements, the defendant was convicted of. *Id.*

"Where a statute lists only a single set of elements, the statute is indivisible and the standard categorical approach must be used." *United States v. Kinney*, 888 F.3d 360, 363 (8th Cir. 2018). Neither party argues that the modified categorical approach applies here, and we agree that the statute is indivisible. At the time of Bennett's conviction, Iowa's going armed with intent statute provided: "A person who goes armed with any dangerous weapon with the intent to use without justification such weapon against the person of another commits a class 'D' felony." Iowa Code § 708.8 (1997). This statute lists a single set of elements, so the categorical approach applies. *See Mathis*, 136 S. Ct. at 2248 ("The comparison of elements that the categorical approach requires is straightforward when a statute sets out a single . . . set of elements to define a single crime.").

In *United States v. Langston*, 800 F.3d 1004 (8th Cir. 2015) ("*Langston II*"), this Court held that going armed with intent is not an ACCA-qualifying violent felony. *Id.* at 1005. The United States argues that *Langston II* does not control here because we based that decision on the Supreme Court's rejection of ACCA's "residual clause." *See Johnson v. United States*, 135 S. Ct. 2551, 2556–57 (2015) (striking down the residual clause on vagueness grounds).

In *United States v. Langston*, 772 F.3d 560, 563 (8th Cir. 2014) ("*Langston I*"), before the ruling in *Johnson*, we held that going armed with intent was a violent felony under the residual clause. In *Langston I*, the United States argued that going armed with intent was a violent felony under both the force clause and the residual clause. *See* Brief of Appellee at 23-29, 772 F.3d 560 (No.

14-1073), 2014 WL 1759839 at \*23-29. In *Langston II*, we held "[i]n light of *Johnson*, Langston's going- armed-with-intent conviction is not a qualifying violent felony." 800 F.3d at 1005. This Court did not address the government's force-clause argument in either *Langston I* or *Langston II*.

Assuming without deciding that *Langston II* does not control here, we hold that going armed with intent is not an ACCA-qualifying violent felony, because it does not necessarily involve the use, attempted use, or threatened use of physical force. The United States argues that going armed with intent necessarily involves the attempted use of physical force, advancing what it calls the "attempted use theory." Under this theory, the United States argues that the elements of the completed crime of going armed with intent, in combination, constitute an "attempted use . . . of physical force against the person of another." Brief of Appellee/Cross-Appellant at 20-21 (quoting *United States v. Alexander*, 809 F.3d 1029, 1031–32 (8th Cir. 2016)). "The elements of attempt are (1) intent to commit the predicate offense, and (2) conduct that is a substantial step toward its commission." *United States v. Spurlock*, 495 F.3d 1011, 1014 (8th Cir. 2007). The United States argues that the elements of going armed with intent necessarily constitute attempt because it combines specific intent (i.e., to use a dangerous weapon against the person of another) with a substantial step (i.e., movement while armed). *Alexander* does not so hold, and the United States cites no prior case, from any jurisdiction, that has adopted its "attempted use theory."

We need not decide whether the elements of a completed crime could ever, under the categorical approach, necessarily constitute a generic "attempt" to use physical force, because we find that the elements of going armed with intent do not. "In applying the categorical approach under ACCA, we examine both the text of the statute and how the state courts have applied the statute." *United States v. Swopes*, 886 F.3d 668, 671 (8th Cir. 2018).

To be convicted of going armed with intent, a defendant must have the specific intent to use a dangerous weapon against the person of another, and

must "go," i.e., move from one place to another. *See State v. Ray*, 516 N.W.2d 863, 865 (Iowa 1994) (going armed with intent "necessarily implicates proof of movement"). But the statute is at least ambiguous as to whether the movement must be in furtherance of the intent. *See* Iowa Code § 708.8 (1997) ("A person who goes armed with any dangerous weapon with the intent to use without justification such weapon against the person of another commits a class 'D' felony."). As set forth in the Iowa Criminal Jury Instructions, the movement and the intent are discrete elements, with no requirement that the movement be in furtherance of, or even in the direction of, commission of the crime:

> The State must prove all of the following elements of Going Armed With Intent:
>
> 1.     On or about the____day of_____, 20___, the defendant was armed with (object or weapon).
>
> 2.     (Object or weapon) was a dangerous weapon as defined in Instruction No.____.
>
> 3.     The defendant was armed with the specific intent to use (object or weapon) against another person.
>
> 4.     While armed with the (object or weapon) the defendant moved from one place to another.

Iowa Crim. Jury Instructions § 800.15. The Iowa Supreme Court has advised that "trial courts should generally adhere to the uniform instructions." *State v. Mitchell*, 568 N.W.2d 493, 501 (Iowa 1997); *see also State v. Ambrose*, 861 N.W.2d 550, 559 (Iowa 2015) (noting the Court is "slow to disapprove of the uniform jury instructions"). And both Bennett and the United States rely on the Iowa Criminal Jury Instructions to establish the elements of going armed with intent. *See* Brief of Appellant at 19; Brief of Appellee/Cross-Appellant at 19.

The statute and applicable jury instructions lead us to conclude that a defendant could be convicted of going armed with intent based on movement not

constituting a "substantial step" toward the use of physical force. The Iowa Supreme Court's decision in *State v. Harris*, 891 N.W.2d 182 (Iowa 2017) (applying pre-2017 amendment version of statute), reinforces this conclusion. In *Harris*, after a verbal altercation with his eventual victim inside a bar, the defendant exited the bar and leaned on the wall outside, smoking a cigarette. *Id.* at 187. When his victim came outside several minutes later, the defendant stabbed him with a knife. *Id.* The Court held that the defendant's exit from the bar, while carrying the knife, was enough to satisfy the movement element of going armed with intent—even though this movement was *away from* the victim, and without any express finding that the defendant left the bar with intent to ambush his victim. *Id. Harris* thus demonstrates that the movement element of going armed with intent need not be a substantial step towards the use of physical force against the person of another.[5]

In *United States v. Gomez-Hernandez*, 300 F.3d 974, 980 (8th Cir. 2002), this Court stated that going armed with intent "will in many (if not all) cases constitute an attempted use of physical force against the victim." Applying the modified categorical approach, we determined that the *Gomez-Hernandez* defendant committed a crime of violence because he actually used physical force against the victim. *Id.* at 980–81.

After we decided *Gomez-Hernandez*, the Supreme Court made clear in *Descamps v. United States*, 570 U.S. 254 (2013), that we may not apply the modified categorical approach to an indivisible criminal statute. *Id.* at 260; *see also Mathis*, 136 S. Ct. at 2253. Thus, we are confronted today with the question implicitly left unanswered in *Gomez-Hernandez*—i.e., whether going armed with intent constitutes the attempted use of physical force in *all* cases. Under the categorical approach, the gap between "many" and "all" is determinative. We

---

[5]Under the government's "attempted use theory," the *Harris* defendant was guilty of an ACCA violent felony the moment he stepped out of the bar, because he had satisfied the movement element and movement is necessarily a substantial step towards commission of the crime.

find there is a "realistic probability" that going armed with intent encompasses conduct not involving the use, attempted use, or threatened use of physical force. *Martin*, 904 F.3d at 596. Thus, going armed with intent under Iowa Code §708.8 (1997) is not a violent felony under ACCA.

Because we hold going armed with intent is not an ACCA-qualifying violent felony, we need not reach Bennett's alternative argument that his conviction for willful injury is also not an ACCA predicate felony. The district court correctly declined to sentence Bennett as an armed career criminal.

### III.   Conclusion

Accordingly, we affirm.

_____