# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1679

_____

| | | |
|---|---|---|
| Michael E. Nikolas, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| City of Omaha, et al., | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: February 11, 2010
Filed: May 17, 2010

_____

Before LOKEN, Chief Judge,[*] GRUENDER and BENTON, Circuit Judges.

_____

LOKEN, Chief Judge.

In July 2000, Michael E. Nikolas purchased 6.79 acres of land within three miles of the Omaha city limits, an area in which the City has statutory planning and zoning authority. See Neb. Rev. Stat. § 14-418. The property included a forested area, a ravine, a house, and a dilapidated two-story structure built by a prior owner without necessary building permits that the City had placarded for condemnation. In the following years, Nikolas had a series of zoning and code enforcement disputes

_____

[*] The Honorable James B. Loken stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2010. He has been succeeded by the Honorable William Jay Riley.

with the City's Planning Department and the Douglas County Health Department. In February 2008, he filed this action against the City of Omaha and Planning Department Code Inspector Scott P. Benson, asserting federal constitutional claims under 42 U.S.C. § 1983 and an inverse condemnation claim under state law. The district court[1] granted summary judgment dismissing Nikolas's federal claims with prejudice and declining to exercise pendent jurisdiction over his state law claims. Nikolas appeals the dismissal of his federal claims. Reviewing the grant of summary judgment *de novo*, we affirm. See Lewis v. Jacks, 486 F.3d 1025, 1027 (8th Cir. 2007) (standard of review). We will discuss the issues raised by Nikolas in the context of the two distinct enforcement actions out of which those claims arose.

## I. The Debris-Filled Ravine.

At some time after he purchased the property, Nikolas dumped construction debris in the ravine, allegedly to stabilize the area and control erosion. When the unsightly debris reached a height of some thirty feet, a neighbor complained to the Douglas County Health Department. On January 15, 2003, the Health Department wrote Nikolas advising that its officers had evidence he was dumping "building rubble and demolition debris" on the property in violation of § 33-27 of the Omaha Municipal Code and ordering him "to cease all illegal dumping activity immediately and apply for written authorization."

On March 1, 2004, Health Department inspector Les Theisen entered the property and photographed the debris. City code inspector Benson accompanied Theisen at the latter's request because, as will become apparent in Part II of this opinion, Benson was already familiar with the property. On March 11, a deputy sheriff issued Nikolas a citation for violating Douglas County's Nuisance Regulation.

---

[1] The HONORABLE LAURIE SMITH CAMP, United States District Judge for the District of Nebraska.

The citation referenced § 23-174.10 of the Nebraska Revised Statutes and the Douglas County Regulation that defined nuisances to include: "14. Building, construction, and demolition debris except debris defined as beneficial fill . . . and issued a valid permit." Six weeks later, Douglas County dropped the charge, and the City charged that the debris was a littering violation of § 18-22(b) of the Omaha Municipal Code ("OMC"). Chapter 18 contains the City's nuisance regulations. Section 18-22(b) provides that it is unlawful for the owner "of any lot or ground in the city" to "cause to allow litter to be deposited" or remain on his land.

Nikolas initially pleaded no contest and was found guilty of the charge. He moved to withdraw the plea when the parties failed to negotiate an appropriate remedy. The County Court denied that motion and, in March 2005, sentenced Nikolas to 24 months probation, ten days in jail, and an additional sixty days in jail unless he promptly completed "a mitigation plan acceptable to the City of Omaha Planning Department." Nikolas appealed. The Nebraska Court of Appeals reversed the conviction because of inadequate plea advice. On remand, the proceedings were dismissed in December 2007 for failure to satisfy speedy trial requirements. In this § 1983 action, Nikolas raises various challenges to his prosecution for violating OMC § 18-22(b). These issues were not raised in the state court action.

First, Nikolas argues that § 18-22 is unconstitutionally vague as applied to him, not because its operative prohibition is impermissibly vague, but because Chapter 18 does not "clearly articulate whether § 18-22(b) applies to littering on . . . Property outside the City's corporate limits." Chapter 18 is impermissibly vague, he explains, because it applies to all property "within the city and, *at the discretion of the duly designated enforcing officer*, all property within three miles of the city limits." OMC § 18-1 (emphasis added). We acknowledge that criminal statutes can be impermissibly vague. See United States v. Washam, 312 F.3d 926 (8th Cir. 2002). But the unusual attempt to apply that doctrine to this prosecution is unsound.

-3-

The Nebraska statutes expressly grant the City broad power to control nuisances and littering on property within three miles of the city limits. Neb. Rev. Stat. §§ 14-102(15), 14-103. They also authorize Douglas County to adopt health and safety regulations that apply to all parts of the county not within city limits "except within the unincorporated area where a city . . . has been granted zoning jurisdiction and is exercising such jurisdiction." Id. § 23-174.10. Here, Douglas County initially charged Nikolas with a violation of its nuisance regulations but dropped that charge because those regulations expressly do not apply in an area "over which zoning jurisdiction has been granted to any city or village." The City then charged a violation of OMC § 18-22(b). Thus, the practical effect of Nikolas's argument -- that neither the County nor the City had jurisdiction to take action against a serious health and safety hazard on his property -- is contrary to manifest legislative intent.

We conclude that § 18-1, properly construed, was plainly an exercise of the City's statutory nuisance jurisdiction over all property within three miles of the city limits, subject to the prosecutorial discretion of a "duly designated enforcing officer" to exempt a particular property from some or all of Chapter 18's restrictions. There is no arguable constitutional flaw in this regime. Nor can Nikolas plausibly claim lack of notice that his property was subject to littering and nuisance regulations. Thus, it is not surprising he did not make this strained vagueness argument to the state courts before pleading no contest to the charge of violating § 18-22(b).

Second, for the same reason, Nikolas argues that § 18-1 unconstitutionally delegated legislative authority to apply the criminal provisions of § 18-22(b) to property within three miles of the city limits. He cites no federal case applying the rarely-invoked non-delegation doctrine to a statute conferring upon prosecutors or enforcement officials the discretion to determine what regulatory violations will be prosecuted. This contention borders on the frivolous. Compare United States v. Guzman, 591 F.3d 83, 93 (2d Cir. 2010).

-4-

Third, Nikolas argues that § 18-22(b) as applied to him violated the Ex Post Facto Clause of the United States Constitution because the City did not determine that § 18-22(b) applied to his property until it charged him with a violation, after the alleged littering occurred. This contention is also without merit. As we have explained, Chapter 18 applied to his property from the time of its enactment in 1980, subject only to the discretion of enforcement officials not to prosecute. Thus, the alleged littering was prohibited by § 18-22(b) long prior to its occurrence.

Finally, Nikolas did not sue Douglas County or its health inspector whose photos of the debris-filled ravine helped establish probable cause for the nuisance and littering citations. Nor does he argue that inspector Theisen violated the Fourth Amendment when he entered the property and took those photos on March 1, 2004. Rather, Nikolas argues that § 18-7 of Chapter 18 violates the Fourth Amendment, facially and as applied to him, because it authorizes Planning Department inspectors "to enter any premises in the city or its extraterritorial jurisdiction at any reasonable time," without requiring that they obtain a warrant. Theisen acted under Douglas County authority. Thus, the facial attack on § 18-7 is irrelevant. Cf. United States v. Stephens, 594 F.3d 1033, 1037-38 (8th Cir. 2010); Roark v. South Iron R-1 School Dist., 573 F.3d 556, 562 (8th Cir. 2009). It is also without merit. An ordinance such as § 18-7 simply authorizes enforcement action. If action taken pursuant to that authority violates Fourth Amendment warrant requirements, the resulting criminal prosecution may be tainted, but that does not render the authorizing statute unconstitutional. See, e.g., Camara v. Municipal Court, 387 U.S. 523 (1967).

City code inspector Benson did accompany health inspector Theisen on March 1, 2004, but Benson's presence did not cause either the nuisance or littering citations. In sweeping fashion, Nikolas argues that all of Benson's warrantless searches violated the Fourth Amendment but discusses only his March 1, 2004, search of the garage, addressed in Part II of this opinion. Benson's undisputed affidavit explained that he visited the property several times during the pendency of the littering proceedings to

inspect the condition of the debris in the ravine and other open areas. If Nikolas intended to include these searches in his unfocused argument, we summarily reject the contention as contrary to the well-established principle that police officers may enter and search "open fields" without a warrant. See Oliver v. United States, 466 U.S. 170 (1984); United States v. Pennington, 287 F.3d 739, 745 (8th Cir.), cert. denied, 537 U.S. 1022 (2002). Thus, the attack on § 18-7 is irrelevant even as to inspector Benson's actions.[2]

For the foregoing reasons, we affirm the dismissal of all § 1983 claims for damages or other relief arising out of or related in any way to the prosecution of Nikolas for littering his property with construction and other debris.

## II. The Dilapidated Garage.

When Nikolas purchased the property, the second structure had been placarded for condemnation and removal because it was in serious disrepair and was unlawfully built without necessary permits. The Chief Housing Inspector gave Nikolas written notice of this action in August 2000 and, in November, ordered him to appear and show cause why the structure should not be condemned and removed. This hearing was continued several times over the next two years while Nikolas obtained repair permits and replaced the siding, roof, and windows on the structure. On September

---

[2] Moreover, Benson acted under authority granted by the Property Maintenance Chapter of the City's Municipal Code, which provides that, "[i]f entry is refused or not obtained, the code official is authorized to pursue recourse as provided by law." OMC § 48-34. Benson testified that, on at least two occasions, he was refused entry to residential premises, obtained a warrant, and returned. The difference in the authorizing language in § 48-34 and § 18-7 is neither troublesome nor surprising. Chapter 48 covers maintenance of existing structures, whereas nuisance violations frequently occur outside the home in areas either visible from public lands or within the "open fields" exception to Fourth Amendment warrant requirements.

27, 2002, the City Planning Director wrote Nikolas regarding the condemnation. Describing the structure as "Converted into garage. REPAIRED," the notice stated:

> This is to inform you that the inspection conducted by Scott P. Benson, Housing Inspector, on September 26, 2002, confirmed that the above-referenced property complies with Chapter 43 of the Omaha Municipal Code, Unsafe and Dangerous Buildings.
>
> Therefore, the City authorizes the release of the placarding . . . dated April 7, 2000 . . . filed with the Douglas County Register of Deeds.

Also on September 26, Nikolas applied for electrical permits to install a disposal, a furnace, a range, a dryer, air conditioning, a dishwasher and 35 outlets in the garage, and in October he applied for a mechanical permit to install an air conditioning unit. Although he intended to convert the upper floor of the garage into living quarters for himself and his mother, he discontinued this construction work in December 2002 after receiving a letter from the local electric utility advising:

> The City of Omaha Planning Department has informed us that your property is not zoned for 2 residential units on the same property. Therefore, the City of Omaha Permits and Inspections Department can not issue a permit or give us authorization to connect service without a valid address. . . . Once you have obtained a valid address, you can obtain a permit from the City of Omaha Permits and Inspections Department. The City of Omaha will do a final inspection, and will authorize us to connect your service.

Nikolas did not apply to divide his property and obtain a second address.

When code inspector Benson accompanied health inspector Theisen to inspect debris in the ravine on March 1, 2004, Benson first knocked on the front door of the main residence to contact Nikolas or his tenant. At this time, Benson averred, he -

saw that the 'garage' had now been renovated to obviously serve as a second residence on the property. The garage featured patio doors, sky light windows, glass block windows of the type used for bathrooms, plumbing piping entering and exiting the building, furnace venting exiting the building, an air conditioning unit attached to the building, and residential-style bow windows. These things are indicative of a dwelling, not a garage.

Benson then circled the garage and "looked in every window and door." Inside, he saw unfinished work, tools, ladders, and construction materials. He knew that this part of the City was zoned to prohibit two separate residences on the same lot. He knew that Nikolas's construction permits had expired, some without final inspections. He knew that the garage had not been inspected or approved for use as a dwelling. He perceived the garage had no functioning electricity, which is a code requirement for a lawful dwelling unit. Based on this visual evidence that the approved use as a garage was changing to unlawful use as a dwelling unit, Benson placed a placard on the sliding glass door leading directly outside from the upper level, where the dwelling-like improvements were being installed, to the top of the incline against which the garage was built. The placard warned in large letters, "DANGER - CLOSED," followed in smaller print by this notice:

> This structure has been determined to be unsafe, unfit for human occupancy, or unlawful, and is ordered closed by the City of Omaha Planning Department. Its occupancy has been prohibited by the City Code Official. Any person who occupies this structure . . . may be prosecuted and punished by a fine of up to $500 and/or imprisonment of up to six months.

Nikolas did not appeal this action to the Planning Department's building board of review, which likely would have stayed inspector Benson's notice until the appeal was heard. See OMC §§ 48-101 and 102. Instead, he unsuccessfully applied to the Planning Department in 2005 to have the garage approved as an "accessory

apartment," see OMC § 55-763(a), and then, nearly four years after the placarding, filed this federal court damage action. On appeal, Nikolas argues that inspector Benson violated the Fourth Amendment by searching the garage without a warrant and violated Nikolas's procedural due process rights by placarding the property.

**A. Fourth Amendment Issues.** Nikolas argues that inspector Benson conducted unreasonable warrantless searches when he left the driveway, circled the garage, and peered in its windows. It is clear that, without a warrant, Benson could enter the property through its open gate and proceed up the driveway to the front door of the main residence to ask for consent to search *inside* any part of the residence. See United States v. Lakoskey, 462 F.3d 965, 973 (8th Cir. 2006), cert. denied, 549 U.S. 1259 (2007); United States v. Weston, 443 F.3d 661, 667 (8th Cir.), cert. denied, 549 U.S. 956 (2006). Likewise, viewing the exterior of the garage while proceeding up the driveway required no warrant. See Air Pollution Variance Bd. v. W. Alfalfa Corp., 416 U.S. 861, 864-65 (1974); Widgren v. Maple Grove Twp., 429 F.3d 575, 584-85 (6th Cir. 2005); United States v. Raines, 243 F.3d 419, 421-22 (8th Cir.), cert. denied, 532 U.S. 1073 (2001). Indeed, "visual observation is no 'search' at all." Kyllo v. United States, 533 U.S. 27, 32 (2001). Nor did inspectors Benson and Theisen need a warrant to proceed from the unfenced residence to inspect portions of the property that fall within the open fields doctrine, such as the ravine. See United States v. Hayes, 551 F.3d 138, 147 (2d Cir. 2008); United States v. Traynor, 990 F.2d 1153, 1157 (9th Cir. 1993). Thus, the only arguable Fourth Amendment violation was Benson walking from the residence to the garage, walking around the garage, and looking in its windows.

Applying the multi-factor test in United States v. Dunn, 480 U.S. 294, 301 (1987), the district court concluded that Benson did not need a warrant to approach the garage and peer in its windows because the garage was not part of the curtilage of the residence some thirty to forty-five feet away. We agree with this conclusion, which is consistent with our decisions that have applied Dunn to other garages and

barns. See United States v. Gerard, 362 F.3d 484, 488 (8th Cir.), cert. denied, 543 U.S. 928 (2004); United States v. Mooring, 137 F.3d 595, 596 (8th Cir.), cert. denied, 525 U.S. 902 (1998); see also United States v. Cousins, 455 F.3d 1116, 1122, 1124 (10th Cir.), cert. denied, 549 U.S. 866 (2006).

Moreover, even if Nikolas had an expectation of privacy in the garage warranting protection comparable to that afforded the curtilage of a residence, we conclude that Benson's minimally intrusive exterior search and look through the windows was constitutionally reasonable. Based on our review of Benson's photos of the garage exterior, it is obvious that he had probable cause to conclude on March 1, 2004, that the structure was in the process of being changed from a lawful garage to an unlawful dwelling, and that it was unsafe and unfit for human occupancy in its unfinished, unapproved condition. Thus, Benson could simply have placarded the property and left. Instead, he looked in the windows, seeing more signs of on-going construction and conversion of the upper level to a residence. Although Camara established that housing and building inspectors need consent or a warrant to *enter* a residence to search for code violations, Nikolas cites no case holding that an inspector who is lawfully on the premises and who sees an apparent public health and safety violation from the exterior of a detached structure needs a warrant before looking in the window to confirm or refute the apparent violation.

**B. Placarding and Due Process.** Nikolas argues that placarding the garage without prior notice and an opportunity to be heard violated his constitutional right to procedural due process. We disagree. Without question, procedural due process requires notice and an opportunity to be heard before a private building may be condemned as a nuisance and demolished. See Hroch v. City of Omaha, 4 F.3d 693, 695 (8th Cir. 1993). But the City had such procedures, as Nikolas well knew in March 2004. The garage was placarded and under an order to be demolished and removed when Nikolas bought the property in July 2000. He promptly received a "First Notice of Violation," which extended the condemnation proceedings, and then an opportunity

-10-

to appear and be heard in November 2000 before the demolition order was enforced. He took good advantage of these predeprivation procedures, persuading the Planning Department to continue the condemnation proceedings for nearly two years while he remedied the conditions that made the garage unsafe and unfit. The Department then released the structure from condemnation in September 2002 as a lawfully permitted garage. Nikolas knew these procedures were available when the garage was replacarded in March 2004, but he did not pursue them.

An additional issue of predeprivation due process could arise if placarding of a structure as unfit for human occupancy caused a severe *temporary* deprivation, such as the emergency closing of a retail establishment. We decline to address that issue because the short answer here is that posting the placard on March 1, 2004, caused *no* deprivation or interference with a protected property interest. The placard was merely a prominent reminder of what Nikolas already knew, as well as a warning to the general public that applicable zoning and building code restrictions prohibited any person from occupying (living in) the garage. Nikolas argues that he was deprived of other *uses* of the structure. Benson denied at his deposition that the placard barred uses other than occupancy, testimony consistent with provisions of the Municipal Code that separately prohibit occupancy and use. See OMC §§ 43-111, 48-122. In any event, the summary judgment record contains no evidence that Nikolas was denied a use other than occupancy, or that he was denied permission to undertake other uses. From this record, it appears that his only pre-placarding use, storing tools and construction materials, continued after placarding. Thus, at a minimum, summary judgment on this tenuous due process claim was properly granted for failure of proof. The only other "use" Nikolas wanted -- occupancy -- was unlawful before and after the placarding.

For the same reason, Nikolas's argument that placarding the garage was an unreasonable seizure is without merit. Nothing was seized. From a Fourth

Amendment perspective, the placarding bore no resemblance to the condemnation and physical destruction of buildings that we upheld in <u>Hroch</u>, 4 F.3d at 696-97.

### III. Conclusion.

Finally, Nikolas argues that the district court abused its discretion in denying his post-dismissal motion to amend the complaint if we determine that he did not adequately plead a procedural due process claim. Like the district court, we have considered that claim on the merits. Accordingly, there was no abuse of discretion. The judgment of the district court is affirmed.

_____