# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-3182

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| Terry Robbins, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 16, 2012
Filed: June 29, 2012

_____

Before WOLLMAN and COLLOTON, Circuit Judges, and HICKEY,[1] District Judge.

_____

WOLLMAN, Circuit Judge.

Terry Robbins appeals the denial of his motion to suppress evidence and a warrant derived from a warrantless police entry onto his property. Because the district court[2] correctly denied the motion, we affirm.

_____

[1]The Honorable Susan O. Hickey, United States District Judge for the Western District of Arkansas, sitting by designation.

[2]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa, adopting the report and recommendation of the Honorable Jon Stuart Scoles, United States Magistrate Judge for the Northern District of Iowa.

I.

At approximately 9:54 p.m. on October 23, 2010, Cedar Rapids, Iowa, police dispatch received a "911" hang-up call. When the 911 operator attempted to call the number from which the 911 call came, the line was busy. The subscriber of that number was shown to the 911 operator as "Carl A. Nelson," and the "automatic location information" received by the 911 operator showed the subscriber as a business with an address of 960 60th Avenue SW in Cedar Rapids. The information displayed on the "computer aided dispatch" system, which was transmitted to the responding officers' in-car computer, simply identified the caller as "Carl A. Nelson" and did not reveal that the subscriber was associated with a business.

Officers Casey Hoeger and Jeff Holst, driving separate cars, responded to the scene. The officers were dispatched at 9:55 p.m. and arrived at the scene at 10:01 p.m. Hoeger arrived first. He approached the scene traveling westbound on 60th Avenue, primarily an industrial area. Hoeger noticed a residence in the 800 block of 60th Avenue, but his in-car GPS map showed the target address as originating midway between some railroad tracks and 11th Street. When Hoeger did not find a residence prior to arriving at 11th Street, he turned around and headed eastbound on 60th Avenue toward the railroad tracks. He pulled into a driveway on the south side of 60th Avenue, where he "noticed lights on on a residence behind two industrial buildings." He pulled up the driveway "a little bit further" and stopped. Tr. 32-33.

Hoeger then observed Holst drive by, proceeding west on 60th Avenue. Like Hoeger, Holst at first did not see the residence. Holst made a U-turn at 11th Street and spotted the reflector tape on Hoeger's car. Hoeger then flashed his flashlight to reveal his location to Holst, who turned into the driveway and joined Hoeger. Hoeger told Holst, "I can't find any other house in this area" and suggested that they "check this place." Tr. 33.

-2-

Both officers then walked up the driveway and approached the residence.[3] Holst observed that the exterior porch light and interior first and second floor lights were on, but the garage light was not. The officers saw no persons, heard no unusual sounds, and observed no indication of a disturbance.

Holst testified that as the officers approached the residence, the double-gate to the breezeway was "wide open; it wasn't just unlatched." Tr. 21. According to Holst, "it's as if the gate wasn't there, because I mean it's a very large gate. It's not like you're walking through a small narrow gate. The whole thing was open." Tr. 21-22. Hoeger testified that he could not remember if the gate was open, but he said that he did not open it. When asked whether Holst opened the gate, Hoeger responded, "[h]e could have. I can't say whether he did or not." Tr. 41. Based on its determination that Hoeger and Holst testified credibly, the district court found that neither Holst nor Hoeger opened the gate. Dist. Ct. Order of May 18, 2011, at 3.

After entering the breezeway, the officers knocked on the front door but received no response. They then conducted a "quick perimeter check" by walking around the residence because, as Holst testified, "there was so many lights on in the house it appeared to us there was somebody home." Tr. 11. They did not see or hear anything amiss, but they could not effectively see in the windows.

---

[3]Because of the nature of Robbins's claims, a detailed description of the property is appropriate. The house and garage share a common roof line, but an open "breezeway" exists between the garage and the house. The breezeway is enclosed by a double wooden gate that is approximately five feet tall. The back of the breezeway opens to the backyard. The double gate opens in the middle and extends nearly the entire width of the breezeway. One side of the double gate has a stake on the back that can be inserted into the cement—preventing the gate from opening—and a latch near the top keeps the other half from opening. Immediately upon entering the breezeway, two steps lead to the porch to the front door on the right. The front and back yards are entirely enclosed by a chain-link fence, so access to the front door can be reached only through the breezeway.

-3-

The officers then returned to the front door and knocked again, receiving no response. While at the door, Holst smelled an odor of marijuana. Hoeger testified that he was "stuffed up" with a cold and initially did not smell marijuana. Tr. 35. When Holst mentioned the odor, however, Hoeger "stuck [his] face up to the crevice of the door" and could smell a "minor whiff" of marijuana. Tr. 42. A K-9 officer was then called to the scene with a drug dog, which immediately "indicated" on the front door of the residence. Tr. 13. Officer Fear, the K-9 officer, then sought a search warrant for the residence while Hoeger and Holst remained at the scene.

During the course of preparing the search warrant application, Fear called Holst for a detailed description of the residence, including the color of the address numbers on the house. At that point, Holst for the first time saw that the address was 925 60th Avenue rather than 960 60th Avenue. Although the numbers were displayed on the exterior wall between the garage door and the breezeway gates, Holst testified that the numbers were black and not easily seen at night, and the outside light above the address was off. In addition, when the gates are open, the numbers may be obstructed. During preparation of the search warrant, it was determined from the Linn County Assessor's records that Robbins owned the property.

Following the issuance of a state search warrant, the property was searched during the early morning of October 24, 2010, revealing the presence of a marijuana growing operation, along with 297 marijuana plants, in the basement. Two venting systems vented odors to the main floor and out the second-floor windows, including one that was open when Hoeger and Holst arrived.

On October 25, 2010, Sergeant Dostal of the Cedar Rapids Police Department attempted to call the phone number listed as making the 911 hang-up call, and "[i]t just kept ringing. It never went to a voice mail or no one ever picked up." Tr. 49. Upon further investigation, Sergeant Dostal identified a Carl A. Nelson Construction Company in Burlington, Iowa. The company had obtained the phone line for a

construction trailer at a site in Cedar Rapids. After the work had been completed, the company unsuccessfully had tried to cancel the telephone line. The company reported that the address of the construction trailer was 1030 60th Avenue SW. A Google search for 960 60th Avenue SW did, however, reflect a reference to a Carl A. Nelson business. Upon investigation, it was determined that there is no 960 60th Avenue SW or 1030 60th Avenue SW.

Robbins was charged with manufacturing and attempting to manufacture 100 or more marijuana plants, in violation of 21 U.S.C. §§ 841 and 846. He moved to suppress the evidence derived from the search of his property. Following the issuance of the magistrate judge's report and recommendation that the motion be denied, Robbins entered a conditional guilty plea that reserved his right to appeal the denial of the motion. The district court subsequently accepted the plea, adopted the report and recommendation, denied the motion to suppress, and sentenced Robbins to 120 months' imprisonment.

II.

"We review the denial of a motion to suppress de novo but review underlying factual determinations for clear error, giving 'due weight' to the inferences of the district court and law enforcement officials." United States v. Replogle, 301 F.3d 937, 938 (8th Cir. 2002) (quoting United States v. Wheat, 278 F.3d 722, 725-26 (8th Cir. 2001)). A district court's "credibility findings are well-nigh unreviewable, so long as the findings are not internally inconsistent or based on testimony that is incoherent, implausible, or contradicted by objective evidence in this case." United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001) (citations omitted).

III.

Robbins argues that the police violated his Fourth Amendment right against unreasonable searches and seizures by walking to his front porch to knock on his front door, as well as by walking around the perimeter of the house and glancing at the windows. He contends that because the evidence providing probable cause for the search warrant was obtained within the constitutionally protected curtilage area of his residence, the evidence obtained through execution of the search warrant should be suppressed.

The Fourth Amendment protects citizens "against unreasonable searches and seizures." U.S. Const. amend IV. "The Fourth Amendment's protection extends to the curtilage surrounding a home." United States v. Weston, 443 F.3d 661, 666 (8th Cir. 2006) (citing United States v. Dunn, 480 U.S. 294, 301 (1987)). "'Curtilage' means 'the area to which extends the intimate activity associated with the sanctity of a man[']s home and the privacies of life.'" Id. at 666-67 (quoting Oliver v. United States, 466 U.S. 170, 180 (1984) (citation and internal quotations omitted)).

"Where a legitimate law enforcement objective exists, a warrantless entry into the curtilage is not unreasonable under the Fourth Amendment, provided that the intrusion upon one's privacy is limited." Id. at 667 (citing United States v. Raines, 243 F.3d 419, 421 (8th Cir. 2001)); see United States v. Anderson, 552 F.2d 1296, 1299-1300 (8th Cir. 1977) (police entry into area where a person holds a reasonable expectation of privacy is lawful so long as the intrusion was justified by "some legitimate reason for being present unconnected with a search directed against the accused") (citation omitted). We have held that police entry through an unlocked gate on a driveway to approach the front door of a residence for a "knock-and-talk" is a reasonable, limited intrusion for legitimate law enforcement objectives. Weston, 443 F.3d at 667; see also Nikolas v. City of Omaha, 605 F.3d 539, 545-46 (8th Cir. 2010) (noting that "[i]t is clear that, without a warrant, [inspector] could enter the

-6-

property through its open gate and proceed up the driveway to the front door of the main residence to ask for consent to search *inside* any part of the residence") (citing United States v. Lakoskey, 462 F.3d 965, 973 (8th Cir. 2006) (concluding that officers "were lawfully allowed to approach [defendant's] front door and contact him for investigative purposes")).

Where officers acting in furtherance of a legitimate law enforcement objective develop a reasonable belief that someone is present in the home, they are justified in proceeding to an alternative entrance following an unsuccessful knock at the front door. See Raines, 243 F.3d at 420-21 (holding officer reasonably proceeded to rear of house to serve civil process after no one answered front door, several cars were parked in the driveway, and the officer suspected the residents did not hear him knock); Anderson, 552 F.2d at 1298-1300 (holding agents did not violate occupant's Fourth Amendment rights by walking around house when no one answered knock at front door, agents suspected someone was home because light was visible inside house, and agents heard dog barking). We have declined to extend the "knock-and-talk" rule, however, "to situations in which the police forgo the knock at the front door and, without any reason to believe the homeowner will be found there, proceed directly to the backyard." United States v. Wells, 648 F.3d 671, 680 (8th Cir. 2011) (citing Young v. City of Radcliff, 561 F. Supp. 2d 767, 788 n.12 (W.D. Ky. 2008)).

As was the case in Raines, the officers here acted in furtherance of a legitimate law enforcement objective and their intrusion upon Robbins's privacy was appropriately limited. Responding to a 911 call that they reasonably believed came from the property, Hoeger and Holst entered the normal access route for any visitor to the house — the driveway and an open gate to the front door. Unlike the situation in Wells, the officers first attempted to reach the homeowner at the front door. See Wells, 648 F.3d at 679-80 (discussing Raines and Anderson). After receiving no response at the front door, they conducted a short, minimally intrusive exterior perimeter search and glance at the windows for someone in need of assistance. See

<u>Nikolas</u>, 605 F.3d at 546 (concluding that inspector's "minimally intrusive exterior search and look through the windows was constitutionally reasonable"). Proceeding around the perimeter in search of an occupant was reasonable based on facts giving rise to a reasonable belief that someone was home — the 911 call and the observation of many lights on in the house. To complete their good faith attempt to conduct a brief welfare check, they returned to knock again at the front door, at which point they noticed the odor of marijuana, leading to the seeking of a search warrant. <u>See</u> <u>United States v. Smith</u>, 783 F.2d 648, 651-52 (6th Cir. 1986) (holding that officers seeking to verify an informant's tip could enter a defendant's driveway and proceed toward front door, then obtain a warrant based on the evidence they observed in the process). In light of these circumstances, we agree with the district court that the officers acted in a constitutionally reasonable manner and that the evidence need not be suppressed.

IV.

The judgment is affirmed.

_____