# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-1659

_____

United States of America

*Plaintiff - Appellee*

v.

Anthony Lynn Bearden

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: November 12, 2014
Filed: March 17, 2015

_____

Before BYE, SHEPHERD, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Following denial of his motions to suppress,[1] Anthony Bearden entered a conditional plea of guilty to conspiracy to manufacture marijuana plants, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), and possession of a firearm in

---

[1]Bearden filed two separate motions: a motion to quash search warrant and to suppress evidence and statements and a motion to suppress statements.

furtherance of a drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A). The district court[2] found Bearden was a career offender and sentenced him to 180 months' imprisonment. Bearden appeals the denial of his motions to suppress and his classification as a career offender. Having jurisdiction under 28 U.S.C. § 1291, we affirm the judgment.

## I. Background

A magistrate judge[3] held a joint hearing on the motions to suppress filed by Bearden and his co-defendant, Charles White. At the hearing, the government presented the testimony of officers involved in obtaining and executing the search warrants. Officer Billy Simpson and Detective Ken Minica of the Polk County, Arkansas, Sheriff's Department both testified that on March 21, 2012, they were attempting to locate an address in rural Polk County as part of an unrelated investigation into identity theft. The area was sparsely populated and heavily wooded, making it difficult to see houses from the road. Unable to locate the address, the officers decided to contact people at nearby residences for assistance.

The officers located a house later identified as Bearden's, but they did not enter the property because of a closed gate on the driveway. The officers left a business card at another residence when no one answered their knock. Then, the officers saw and drove down another driveway through a wooded area. Both officers testified they did not open a gate to access the property. At the end of the driveway was a house, and the driveway looped around the house. Approaching from the north, the officers did not see a door to the residence, so they continued on the circular drive to the south

---

[2]The Honorable Brian C. Wimes, United States District Judge for the Western District of Missouri.

[3]The Honorable James C. England, United States Magistrate Judge for the Western District of Missouri.

-2-

side of the house, where they parked behind a vehicle. On the south side, they saw a door and a carport. Both officers testified they believed this was the front entrance of the house.

At this point, the officers saw co-defendant White walking through a fenced-in area toward them. They also noticed a metal shop building on the property. When they got out of their car, both officers smelled a strong odor of "green marijuana." Officer Simpson spoke with White and showed him a picture of the person they were looking for. White said he did not know his neighbors but knew a young couple lived on the adjoining parcel of property. After talking with White, the officers left the property; on their way out, they noticed a surveillance camera on a post near the driveway. Detective Minica also noticed a surveillance camera on the west side of the shop building.

Officer Simpson and Detective Minica returned to White's property later that day with additional officers to investigate the marijuana smell. Officer Simpson testified the marijuana smell "was even stronger" than it had been earlier in the day; Detective Minica testified the smell was "overwhelming." The officers attempted to make contact with White, but no one answered at his front door. The officers decided to apply for a search warrant. Officer Simpson, Detective Minica and COMET[4] Drug Task Officer (TFO) Greg Tiller remained at the property to secure it. After about thirty minutes, the officers observed a man on an all-terrain vehicle (ATV) who was approaching from the east through the timber and from behind an outbuilding.

The officers stopped the man, who identified himself with a Missouri driving permit as Anthony Bearden. TFO Tiller told Bearden they were getting a search warrant for White's property. Bearden told TFO Tiller he rented the adjoining

---

[4]COMET refers to the Combined Ozarks Multijurisdictional Enforcement Team.

property from White and was returning the ATV to White. Bearden wore a large Bowie-style knife on his belt. TFO Tiller took the knife and handcuffed Bearden. TFO Tiller testified Bearden was cooperative. Bearden then allowed TFO Tiller to search his pockets, where TFO Tiller found a piece of paper with directions about water and fertilizer, "relevant to the growing of something," an empty gallon-sized zip-top bag, and a set of keys that included a key to the metal outbuilding. TFO Tiller testified Bearden smelled strongly of mothballs. TFO Tiller placed Bearden in the back of a squad car "until [he] could figure out exactly what [he] wanted to do with him."

TFO Tiller spoke with Bearden while Bearden was sitting in the back of the car. TFO Tiller asked him if he had "anything illegal at his residence," to which Bearden responded that he had "personal use marijuana." At TFO Tiller's request, Bearden agreed to allow the officers to search his property. TFO Tiller and another officer drove Bearden to his driveway, where Bearden gave them permission to open the gate and drive up the driveway. Once on Bearden's property, TFO Tiller smelled the strong odor of mothballs, as well as the odor of green marijuana. TFO Tiller testified Bearden volunteered that he had seen numerous marijuana plants in the metal storage shed near his house and in the metal shed near White's house. Inside his own house, Bearden showed the officers where some personal use marijuana was located in a closet, and officers found additional marijuana and marijuana paraphernalia.

TFO Tiller relayed the information about the odor of green marijuana, as well as Bearden's statements about marijuana, to TFO Carpenter, who had left to seek a search warrant for White's property. TFO Carpenter told TFO Tiller he would seek a search warrant for Bearden's property as well. TFO Tiller then recited to Bearden the Miranda warnings and spoke with him again about the sheds. At some point, Bearden told TFO Tiller he was on probation. During the search of Bearden's property, the officers found over 800 marijuana plants in the shed. During the search

-4-

of White's property, the officers found hundreds of marijuana plants growing in the shop building.

Co-defendant White presented two witnesses at the suppression hearing. Chris Sprague, a neighbor who lived across the road from White, testified that White had a gate on his driveway that "was closed as always" when officers arrived and that they had to open the gate to arrive at White's house. Sprague also testified that a sign on the gate read "No Trespassing." George Rush, a longtime friend who often visited White, also testified that White had a gate on his driveway that was always closed, though unlocked, and a sign that read "No Trespassing, Keep Out."

Following the evidentiary hearing, the magistrate judge recommended granting Bearden's motion to suppress the statements he made before he was Mirandized[5] but recommended denying the remainder of White's and Bearden's motions. The magistrate judge specifically found the officers' testimony was more credible than the testimony of White's witnesses and found that the gate at the end of White's driveway was open both times the officers drove up White's driveway. On February 11, 2013, the district court[6] adopted the magistrate judge's report and recommendation.

Bearden entered a conditional guilty plea to one count of conspiracy to manufacture 1,000 or more marijuana plants, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), and one count of possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), preserving his right to appeal the denial of his motions to suppress. In the presentence report (PSR),

_____

[5]At the suppression hearing, the government conceded Bearden was not properly Mirandized when he made some of his challenged statements. The court suppressed those statements and the government does not appeal that decision.

[6]The Honorable Richard E. Dorr, late a United States District Judge for the Western District of Missouri.

the probation officer recommended Bearden qualified as a career offender pursuant to United States Sentencing Guideline (USSG) § 4B1.1 based on two earlier convictions for burglary of a commercial building and one earlier conviction for escape. As a career offender, Bearden faced a Guidelines range of 262–327 months' imprisonment. At sentencing, Bearden argued his prior convictions for burglary and escape should not count as "crimes of violence" pursuant to USSG § 4B1.2(a). The court overruled Bearden's objection but sentenced Bearden to the mandatory minimum sentence of 120 months' imprisonment on the drug conspiracy conviction followed by the mandatory minimum consecutive sentence of 60 months' imprisonment on the firearm conviction, for a total term of imprisonment of 180 months. Bearden timely filed a notice of appeal.

## II. Discussion

On appeal from the denial of a motion to suppress, we review the district court's factual findings for clear error and its conclusions of law de novo. United States v. Woods, 747 F.3d 552, 555 (8th Cir. 2014). This includes the factual finding that consent to search was voluntary. United States v. Meza-Gonzalez, 394 F.3d 587, 591 (8th Cir. 2005). "We affirm unless the denial of the motion is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake was made." United States v. Douglas, 744 F.3d 1065, 1068 (8th Cir. 2014) (quotation omitted).

Bearden asserts the district court erred in finding that the officers lawfully entered White's property and, thus, in denying his motion to suppress any evidence seized from White's property. The government argues Bearden lacks standing to challenge the search of White's property. "Fourth Amendment rights are personal and may not be vicariously asserted." United States v. Randolph, 628 F.3d 1022, 1026 (8th Cir. 2011) (quotation omitted). A person challenging the constitutionality of a search must demonstrate a reasonable expectation of privacy in the particular

area to be searched. Id. To show he had a legitimate expectation of privacy that was violated by the challenged search and seizure on White's property, Bearden must show "(1) he himself asserted a subjective expectation of privacy in the place searched or object seized, and (2) his subjective expectation is objectively reasonable." Douglas, 744 F.3d at 1069 (quotation omitted). "The first question is a question of fact, the second is a question of law." Id.

Bearden presented no evidence to show he "asserted a subjective expectation of privacy" in White's property. Instead, officers testified that when they questioned White during their visit to the property, he denied knowing Bearden personally and Bearden described White only as his landlord. "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Rakas v. Illinois, 439 U.S. 128, 134 (1978). Bearden points to nothing in the record to support the conclusion that he held a reasonable expectation of privacy in White's property. We agree with the magistrate judge[7] that Bearden lacked standing to challenge the officers' entry onto White's property and the resulting seizure of evidence from that property.

In the alternative, Bearden asserts he has standing to challenge the officers' entry onto White's property because the purportedly unlawful entry led directly to his own seizure and interrogation and to the search of his own property. The district court did not rule on this alternative theory of standing. Instead, the district court denied the motion on the merits. Similarly, on appeal, the government does not address whether Bearden has standing under this alternative theory and simply asserts

---

[7]The magistrate judge found Bearden did not meet his burden of establishing a reasonable expectation of privacy in White's property. As noted *infra*, the district court did not address the standing issue, instead concluding that even if Bearden had standing to argue that officers illegally entered White's property, the argument would fail because there was no unlawful entry onto the property.

the officers lawfully entered the property. Because we agree the officers lawfully entered White's property, and thus no Fourth Amendment violation occurred, we can resolve this issue without addressing Bearden's alternative theory of standing.

Bearden insists the officers twice trespassed and illegally entered White's property through a closed and secured gate, which was clearly marked "No Trespassing." He contends the court erred by crediting the testimony of the officers that the gate was open rather than the testimony of Sprague and Rush who testified that the gate was always closed. "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Meza-Gonzalez, 394 F.3d at 592 (quoting Anderson v. Bessemer City, 470 U.S. 564, 575 (1985)). Here, the magistrate judge made a factual finding, based on the officers' testimony, that the gate was open and the district court adopted that finding. Bearden offers nothing to convince us that this finding was clearly erroneous.

Bearden next argues the officers acted in violation of the Fourth Amendment when they drove up White's driveway and entered his curtilage without a warrant or a showing of exigent circumstances. The Fourth Amendment protects not only residences against unreasonable searches and seizures, but also the curtilage surrounding the residence. United States v. Wells, 648 F.3d 671, 674–75 (8th Cir. 2011). The government does not dispute that the officers entered the curtilage of White's home but asserts the officers' entry onto the curtilage was constitutionally reasonable. "Where a legitimate law enforcement objective exists, a warrantless entry into the curtilage is not unreasonable under the Fourth Amendment, provided that the intrusion upon one's privacy is limited." United States v. Weston, 443 F.3d 661, 667 (8th Cir. 2006).

When the officers first entered White's curtilage, they were investigating criminal activity wholly unrelated to White or Bearden and drove up White's driveway only to obtain assistance in locating an address. Both officers testified they believed the south side of the house, which had a door and carport, was the front of the house. Bearden has offered no evidence to suggest otherwise. The officers approached the house during the day and White met them in the driveway before they had a chance to knock on the door. "'[N]o Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways." Wells, 648 F.3d at 679 (quoting United States v. Reed, 733 F.2d 492, 501 (8th Cir. 1984)).

Once Officer Simpson and Detective Minica discovered evidence of criminal activity, based on the strong odor of marijuana, they were permitted to return to the property for a "legitimate law enforcement objective." United States v. Robbins, 682 F.3d 1111, 1115 (8th Cir. 2012) (quotation omitted). "We have held that police entry through an unlocked gate on a driveway to approach the front door of a residence for a 'knock-and-talk' is a reasonable, limited intrusion for legitimate law enforcement objectives." Id. (citing Weston, 443 F.3d at 667). Under these circumstances, the officers permissibly re-entered White's property for a legitimate law enforcement purpose and neither consent nor exigent circumstances were necessary to justify the return visit.

Bearden next argues he "was detained illegally and interrogated without Miranda [and t]he officers did not have a reasonable, articulable suspicion that [he] was engaged in criminal activity to justify the custodial detention."[8] The Fourth

[8]To the extent that Bearden is claiming his detention was illegal because it stemmed from the officers' illegal entry onto White's property, we disagree. As noted *supra*, we agree with the district court that the officer's entry onto White's property was lawful.

Amendment allows law enforcement officers to "conduct a brief investigative stop when they have reasonable, articulable suspicion that a person is committing or is about to commit a crime." United States v. Horton, 611 F.3d 936, 940 (8th Cir. 2010). "This standard requires that officers be able to point to specific, articulable facts justifying the seizure." Id. "The existence of reasonable, articulable suspicion is determined by the totality of the circumstances, taking into account an officer's deductions and rational inferences resulting from relevant training and experience." Id. (citing United States v. Arvizu, 534 U.S. 266, 273–74 (2002)). Furthermore, "an officer may temporarily detain an individual during a Terry stop 'to determine the suspect's identity or to maintain the status quo while obtaining more information.'" Id. at 941 (quoting United States v. Hernandez-Hernandez, 327 F.3d 703, 706 (8th Cir. 2003)).

When Bearden arrived on White's property, officers were in the process of requesting a search warrant for the property, which they believed was being used to cultivate marijuana. Bearden arrived from the back of the property, where officers suspected the marijuana operation was located. Bearden smelled strongly of moth balls and had a large Bowie knife hanging on his belt. See United States v. Lego, 855 F.2d 542, 545 (8th Cir. 1988) (upholding justification for continued detention based on knife officer found and removed from case on defendant's belt). During a routine pat down search, TFO Tiller discovered a suspicious note regarding fertilizer, indicating Bearden might be involved in the suspected grow operation. He also told the officers that he was returning a vehicle belonging to White, his landlord, and that he lived next door, which directly contradicted White's statement to officers that he did not know his neighbors. Bearden does not contest these facts on appeal. The district court properly concluded that the officers had a reasonable, articulable suspicion that Bearden was involved in criminal activity, and his detention was justified.

-10-

Bearden further contests the district court's conclusion that he freely consented to the search of his home. "The government bears the burden of proving voluntary consent by a preponderance of the evidence." Meza-Gonzalez, 394 F.3d at 592. Bearden asserts his consent was not voluntary because it was given after he was approached by three armed officers, placed in custody, and not advised of the Miranda warnings. Whether consent was voluntarily given turns on a variety of factors, including a defendant's age, intelligence, and education; whether he cooperates with police; his knowledge of his right to refuse consent; and his familiarity with arrests and the legal system. United States v. Escobar, 389 F.3d 781, 785 (8th Cir. 2004). Also relevant is the environment in which consent was given and whether the police threatened, intimidated, punished, or falsely promised something to the defendant; whether the defendant was in custody or under arrest when consent was given and, if so, how long he had been detained; and whether consent occurred in a public or secluded area. Id.; United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001).

Admittedly, a few facts weigh in Bearden's favor: He was handcuffed at the time and had been for at least fifteen minutes, he had not yet been read the Miranda warnings, and his consent was given in a secluded wooded area. But he offers no evidence to counter the officers' testimony that he was not threatened, punished, intimidated, or promised anything for his consent and that he had been cooperative with officers from the first contact. In addition, during the suppression hearing, the government presented evidence that Bearden had four prior felony convictions, suggesting his familiarity with legal procedure, the Miranda warnings, and his right to refuse consent. Given the evidence presented at the hearing, the district court's finding that Bearden volunteered his consent to search his house was not clearly erroneous.

Finally, Bearden contests his classification as a career offender under USSG § 4B1.1. We review de novo the classification of a defendant as a career offender. United States v. Boose, 739 F.3d 1185, 1186 (8th Cir. 2014). Bearden argues the district court erred in finding his two prior convictions for burglary under Missouri law qualified as crimes of violence under USSG § 4B1.2 because they both involved burglaries of commercial buildings, rather than residences.

Bearden acknowledges our decisions in United States v. Cantrell, 530 F.3d 684 (8th Cir. 2008), and United States v. Bell, 445 F.3d 1086 (8th Cir. 2006), in which we concluded that a conviction for second-degree burglary in violation of Missouri law qualified as a "crime of violence" within the meaning of USSG § 4B1.2(a). Bearden asks us to reconsider those decisions in light of Begay v. United States, 553 U.S. 137 (2008), and Descamps v. United States, 570 U.S. —, 133 S. Ct. 2276 (2013).

A "crime of violence" includes "any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that . . . is burglary of a dwelling . . . or otherwise involves conduct that presents a serious potential risk of physical injury to another." USSG § 4B1.2(a). We have consistently held that "'any generic burglary is a crime of violence' for purposes of [USSG] § 4B1.2(a)(2)." United States v. Eason, 643 F.3d 622, 623–24 (8th Cir. 2011) (quoting United States v. Stymiest, 581 F.3d 759, 768 (8th Cir. 2009)). We have also previously concluded that "Begay does not undermine our previous decisions holding that generic burglary, including burglary of a commercial building, is a crime of violence." United States v. Haas, 623 F.3d 1214, 1220 n.6 (8th Cir. 2010) (citing Stymiest, 581 F.3d at 768–69).

In United States v. Olsson, 742 F.3d 855, 856 (8th Cir. 2014), we examined Missouri's second-degree burglary statute in light of Descamps. In Olsson, we concluded that "[b]ecause the basic elements of the Missouri second-degree burglary

statute are the same as those of the generic burglary offense, Olsson's prior conviction qualifies as a 'crime of violence' under the categorical approach." <u>Olsson</u>, 742 F.3d at 856. It is well-established in our circuit that one panel cannot overrule an opinion filed by another panel. <u>Wells</u>, 648 F.3d at 675. Accordingly, we conclude the district court correctly ruled that each of Bearden's prior Missouri convictions for burglary was a crime of violence, making Bearden a career offender.[9]

### III. Conclusion

For the reasons set forth above, we affirm the district court's denial of Bearden's motions to suppress and uphold his sentence.

———————————————

———————————————

[9]Bearden also contests the classification of his escape conviction as a crime of violence. Because we conclude that both of his prior burglary convictions qualify as predicate crimes of violence under USSG § 4B1.2(a), we do not reach this issue.

-13-